_____
                                                    )
**JEAN-MICHEL BARTOLO,**                             )
                                                    )
    **Plaintiff,**                )
                                                    )
    **v.**                         )    **Case Nos. 1:17-cv-01453(APM)**
                                                    )           **1:18-cv-01681 (APM)**
                                                    )
**WHOLE FOODS MARKET GROUP, INC.,**                 )
                                                    )
    **Defendant.**                  )
_____             )

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Plaintiff Jean-Michel Bartolo, a former Whole Foods employee, sued Defendant Whole Foods Market Group in two related cases following his termination from the company. In the first case, 1:17-cv-1453—which the court refers to as _Bartolo I_—Plaintiff alleges retaliation under the D.C. Wage Theft Prevention Act ("DCWTPA") for his claimed role in reporting manipulation of an employee bonus program, and he brings three quasi-contract claims based on the company's employee handbook. In the second case, 1:18-cv-1681—which the court will shorthand _Bartolo II_—Plaintiff sued Defendant for defamation; violation of the DCWTPA for failing to make a bonus payment upon his termination; and three quasi-contract claims related to the alleged unpaid bonus.

Defendant now moves for summary judgment on all counts in both cases. Plaintiff cross-moves for partial summary judgment on his unpaid bonus claim under the DCWTPA. For the reasons that follow, Defendant's motion is denied as to Plaintiff's claims of retaliation and common law defamation but is granted as to all other claims. Plaintiff's partial motion is denied.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     *Plaintiff's Employment History at Whole Foods*

Plaintiff Jean-Michel Bartolo began his employment at Defendant Whole Foods in 1997. *See* Compl., *Bartolo II*, ECF No. 9, ¶ 6.  For fourteen years he worked as a Store Team Leader at various stores in the Washington D.C.-area.  *Id.*   In January 2013, Plaintiff transferred to Defendant's Georgetown store.  *Id.*   While working at the Georgetown store, Plaintiff was cited for two infractions.  *See* Def.'s Mot. for Summ. J., ECF No. 14 [hereinafter Def.'s Mot.], Ex. 7, ECF No. 14-10, at 2, 4–5.[1]  The first incident occurred in November 2014, when Plaintiff divulged confidential information regarding another employee in violation of Defendant's company policy. *Id.* at 4–5.  Plaintiff received a written citation, which he signed.  *Id.* at 4.  The citation indicated that "any further violation of Unsatisfactory Team Member Conduct policies will result in termination of employment." *Id.*  Plaintiff was cited again in May 2015, when he "fail[ed] to meet company standards for a Store Team Leader" because he lacked an "appropriate leadership presence," did not satisfactorily execute the "Armed Forces Day Spaghetti Dinner Event," and his store displayed "unacceptable retail standards."  *Id.* at 2.   Notes from the Order-to-Shelf Coordinator for the Mid-Atlantic Region, Jane Mueller, include a concern about "[s]tore cleanliness and organization."  *Id.* at 3; Def.'s Mot., Ex. 23, Decl. of Jane Mueller, ECF No. 14-40 [hereinafter Mueller Decl.], ¶ 1.  No further action was taken against Plaintiff following these citations.

Defendant contends that Plaintiff had fraught relationships with some subordinates, which Whole Foods discovered only after his termination, but which otherwise might have resulted in a

---

[1] All ECF Numbers refer to the docket numbers in Case No. 1:18-cv-1681 (*Bartolo II*), unless otherwise noted.

citation or termination.  Def.'s Mot. at 5–6.  For example, Defendant asserts that Plaintiff had a romantic relationship with at least one female subordinate, *id.* at 5, and that he sent inappropriate and sexually suggestive emails to another.  ECF No. 14-10, at 48–53.  There have also been allegations of discrimination by Plaintiff against minority employees.  *See, e.g.*, Def.'s Mot., Ex. 4, ECF No. 14-7, ¶ 13.  But again, Defendant does not offer any evidence that Plaintiff was disciplined for this behavior.

### 2. *Gainsharing Manipulation Allegations*

Defendant offered what it called a "Gainsharing Program," an incentive program that awarded bonuses to employees whose departments came in under budget.  Def.'s Mot., Ex. 8, Decl. of Nicole Wescoe, ECF No. 14-38 [hereinafter Wescoe Decl.], ¶ 2.  Store Team Leaders were not eligible to participate in the program.  *Id.*

On October 24, 2016, Defendant received on its anonymous tip line a complaint about execution of the Gainsharing Program at the Kentlands store in Gaithersburg, Maryland.  Def.'s Mot., Ex. 11, ECF No. 14-13 [hereinafter Def.'s Ex. 11], at 3.  The tipster claimed to have observed the Kentlands store manager order shifting labor costs from one department to another department "to make the store look good" and to allow the store manager to get a bonus.  *Id.*  Rose Smith, an employee of Team Member Relations, followed up on the tip.  On October 25, 2016, she reported that "Team Member Services . . . investigated the allegations outlined in this anonymous call and found them to be without merit."  *Id.* at 4.  It is not clear whether the tipster had access to this finding, and if so, when.  However, a hotline-call record indicates that the tipster followed up three days after Smith's notation, with additional specifics about shifting of labor costs between departments.  *Id.*  Defendant also received additional anonymous calls on the tip line on October

26 and 30, 2016, about Gainsharing Program manipulation at the Kentlands store. *Id.* at 6–7, 9–10.

Plaintiff claims that he was the anonymous tip-line caller. He contends that, after hearing from a fellow employee that the employee was directed to participate in gainsharing manipulation, he called the tip line. Def.'s Mot., Ex. 12, Pl.'s Resp. to Def.'s First Set of Interrogatories, ECF No. 14-14 [hereinafter Pl.'s Resp. to 1st Interrog.], at 2–3, 8. Plaintiff claims that he anonymously called the tip line at least four times "after his initial call was rejected by Smith as 'without merit.'" *Id.* at 8.

Defendant received another call on the tip line about the Gainsharing Program on November 12, 2016. *See* Def.'s Ex. 11 at 13. This time the call concerned the Georgetown store. The tipster reported labor shifting and complained that Plaintiff was "responsible for these labor-transfer issues" and that he had failed to address the impropriety. *See id.*

These tip-line calls prompted Defendant to initiate an investigation. Pl.'s Mem. In Opp. to Def.'s Mot. for Summ. J., ECF No. 34 [hereinafter Pl.'s Opp.], Ex. H, Dep. of David Gearheart, ECF 25-1 [hereinafter Gearheart Dep.], at 106–07. On November 14, 2016, Plaintiff was interviewed as part of that investigation. Pl.'s Opp., Ex. B, Dep. of Jean-Michel Bartolo, ECF No. 24-2 [hereinafter Bartolo Dep.], at 168–70; *see also* Pl.'s Opp., Ex. Z, ECF No. 28-4 [hereinafter Ex. Z]. According to contemporaneous notes of the interview, Plaintiff did not explicitly identify himself as one of the tip-line callers. *See* Ex. Z. Plaintiff did say, however, that other employees had told him about episodes of gainsharing manipulation, and that he had encouraged at least one other employee to make a report to the tip line. *Id.* at 5–6.

Plaintiff claims that three days after his interview, Scott Allshouse, Whole Foods's Regional President for the Mid-Atlantic Region, came to the Georgetown store to discuss the

gainsharing investigation. Bartolo Dep. at 421–22. According to Plaintiff, Allshouse "directed [Plaintiff] to stop telling team members to call the tip line," and to "report [gainsharing abuses] to him directly and not the tipline." Pl.'s Resp. to 1st Interrog. at 9. For his part, Allshouse recalls meeting with Plaintiff in November 2016 at the Georgetown store but does not remember telling Plaintiff not to have people call the tip line. Pl.'s Opp., Ex. J, Dep. of Scott Allshouse, ECF No. 25-3 [hereinafter Allshouse Dep.], at 133–34. Another Whole Foods executive, David Gearheart, testified that Allhouse would have had access to investigation materials, including notes of Plaintiff's interview, in November or early December 2016. Gearheart Dep. at 7, 118–21.

Plaintiff does not point to any other testimony or evidence showing that any other Whole Foods official viewed Plaintiff as having called the tip line.

### 3. *Rodent Problems at the Georgetown Store*

From January 2013 through early 2017, Plaintiff worked as a Store Team Leader at Defendant's Georgetown store in Washington, D.C. *See* Compl., *Bartolo II*, ¶ 6; Wescoe Decl. ¶¶ 6–7. Rodents were a serious recurring problem throughout Plaintiff's tenure at the Georgetown store. Def.'s Mot., Ex. 21, Expert Rebuttal Report by Dr. Jill M. Gordon, ECF No. 14-23 [hereinafter Gordon Expert Rpt.], at 6. The problem had persisted for many years. *Id.*; *see also* Pl.'s Opp., Ex. E, Dep. of Derek Gruber, ECF No. 24-5 [hereinafter Gruber Dep.], at 30–31 (noting reports of pest issues in 2014). One Store Team Leader noted rodents in the Georgetown store as early as 2012, well before Plaintiff began working there. Pl.'s Opp., Ex. CC, ECF No. 28-6, ¶¶ 5– 6.

During Plaintiff's time leading the store, Defendant hired a pest-management company, Steritech, in an attempt to control the problem. *See* Gordon Expert Rpt. at 7. In 2016, the pest-control company removed several hundred mice from the store over the course of more than 70

visits. *Id.* Steritech also advised Whole Foods on strategies to help manage the problem, suggesting that it direct its employees to "clean under shelves, not move rodent control, seal holes, move equipment, and many other items . . . to assist in [Defendant's] pest control program and prevent or help remediate the pest problems." *Id.* But, according to an expert rodentologist retained by Defendant, the "sanitation conditions and many of the structural issues . . . were not properly addressed" by Plaintiff, so the rodent problem persisted. *Id.* at 8.

### 4. *Plaintiff's Application and Transfer to the Tenleytown Store*

Meanwhile, in late 2016 or early 2017, Plaintiff sought a transfer and applied to be Store Team Leader at the Tenleytown store. Bartolo Dep. at 201–02; Wescoe Decl. ¶ 3. Plaintiff formally interviewed for the job several weeks later. Bartolo Dep. at 205–07; Wescoe Decl. ¶ 6. Plaintiff got the job, and Whole Foods announced the transfer on February 6, 2017. Wescoe Decl. ¶¶ 6–7; *see also* Def.'s Mot., Ex. 9, ECF No. 14-11, at 2.

### 5. *Georgetown Store Closure and Plaintiff's Termination*

On February 9, 2017, the District of Columbia Department of Health closed the Georgetown store for failing "to minimize the presence of . . . pests on the premises." ECF No. 14-10, at 56–57. Plaintiff was on vacation on the day that the Health Department shut down the Georgetown store, *see* Pl.'s Opp., Ex. F., Dep. of Mansur Aman, ECF No. 24-6, at 19–22, but when he returned, he was apparently given a specific list of tasks to complete in order to get the store reopened, Mueller Decl. ¶ 8. The record is not clear on exactly when Plaintiff received the instructions, but he seems to have received them during a visit by Mueller and Allshouse just a day or two after the store closed. In his deposition, Allshouse referenced a meeting during which he and Mueller "instructed [Plaintiff] on the things he should focus on in order to get the store reopened and to build the confidence back of the customers." Allshouse Dep. at 167. But Allhouse

could not remember precisely when that meeting occurred, stating that it was "probably" on the evening of February 10, 2017. *Id.* at 168. Mueller remembered giving Plaintiff instructions at some unspecified point *after* she and Allshouse observed the problems at the Georgetown store. Mueller Decl. ¶¶ 7–9; *see also* Def.'s Mot., Ex. 17, ECF No. 14-19 [hereinafter Wescoe Dep.], at 14–15 (Plaintiff was given a list of duties "after the store was closed."). In any event, Plaintiff was apparently asked to take certain steps to get the store cleaned up and reopened following the store closure but prior to February 12, 2017, when Mueller returned.

Two days after the store closure, Allshouse sent a text message to Ken Meyer, the Executive Vice President of Operations, stating, "I [w]ant to write Jane up and ask JM"—referring to Plaintiff—"to leave with a separation agreement. Can you support that decision." Pl.'s Opp., Ex. W, ECF No. 28-1 [hereinafter Ex. W], at 11. A few minutes later, Allshouse sent a second message: "Again. I'm offering him a separation agreement. Pay to go. And remind him that he takes good care of TMs and to keep that in mind to not hurt them by doing anything crazy." *Id.* at 12.

On February 12, 2017, Mueller visited the store again, this time on her own, and took photographs of the condition of the sales floor and the store in general. Pl.'s Opp., Ex. D, ECF No. 24-4 [hereinafter Mueller Dep.], at 67–68, Exs. 4, 5; Def.'s Mot, Ex. 22, Decl. of Scott Allshouse, ECF No. 14-39, Ex. A. Mueller also learned that "[o]n [Plaintiff]'s watch a sprinkler was broken," causing "substantial damage." Mueller Decl. ¶ 9. According to Allshouse, Mueller was "disgusted by her visit in the store" and felt like Plaintiff had not listened to the instructions he was given. Allshouse Dep. at 28–29. Later that evening, Mueller relayed her findings to Allshouse and Nicole Wescoe, the Regional President of the Northeast Region. Wescoe Decl. ¶ 1; Mueller Dep. at 72–73, 109–10.

The following day, February 13, 2017, Mueller, Allshouse, Wescoe, and Gearheart met to "recap[] [Mueller's] visit to the store." Wescoe Dep. at 46. The group decided to "separate [Plaintiff] for gross insubordination." *Id.* at 47; *see also* Mueller Decl. ¶ 12. On the morning of February 14, 2017, Mueller and Gearheart informed Plaintiff that he was being terminated. *See* Pl.'s Opp., Ex. X, ECF No. 28-2, at 5; Wescoe Dep. at 65. Plaintiff apparently became very emotional and "walked out." Wescoe Dep. at 65.

Later that same morning, Mueller met with approximately ten members of the Georgetown store's leadership to inform them of Plaintiff's termination. Mueller Decl. ¶ 13. She informed them that Plaintiff "had been separated from Whole Foods . . . and let them know that [they] needed to carry on and take care of each other, team members," and customers. Mueller Dep. at 157–158. According to Mueller, she did not tell the group why Plaintiff was terminated, nor did she make any disparaging remarks "about him or his performance as a Store Team Leader." Mueller Decl. ¶¶ 13–14. Mueller did not specify whether Allshouse attended, or spoke at, the meeting. *See* Mueller Decl.

Derek Gruber, an Associate Store Team Leader, also testified that "there was a time on the sales floor when [] Allshouse said he found a mice nest and said, this is the reason why [Plaintiff's] being terminated, not because the store was shut down, because of all the other things." Gruber Dep. at 6, 85–86. Gruber explained that the "meeting," which involved a "small group of people," took place "during that whole cleanup process right after the store was shut down and everybody came to the store . . . at some point that night he said it." *Id.* at 86–87. As discussed below, exactly what was said about Plaintiff's termination, and by whom, is the subject of some disagreement.

The same day that Plaintiff was terminated, Defendant paid him (1) $7,306.26 in salary earned during the most recent pay period, (2) $1,086.51 relating to stock options, (3) $135,408.41

in unused paid time off he accumulated over the years, and (4) $15,777.55 for an Economic Value Added ("EVA") Bonus he had earned during the first fiscal quarter of 2017, which ended on January 14, 2017. Def.'s Mot., Ex. 24 ¶ 12. Plaintiff asserts that he was also owed approximately $11,000 for an additional EVA Bonus, which was the amount remaining in his EVA Bonus Individual Pool at the time of his termination. *See generally* Pl.'s Partial Motion for Summ. J., ECF No. 15 [hereinafter Pl.'s Partial Mot.]; *see infra* § IV.D.

Following Plaintiff's termination, regional leadership offered him a separation package, which included a $60,000 separation payment. Wescoe Dep. at 86. But Plaintiff, acting "on the advice of [his] counselor," declined the payment. Def.'s Mot., Ex. 9, ECF No. 14-11, at 4; Wescoe Dep. at 66. According to Defendant, it was during this exchange that Plaintiff asserted for the first time that he was a whistleblower. Def.'s Mot. at 12 (citing Allshouse Dep. at 107–108; Wescoe Decl. ¶ 10).

### B. Procedural Background

#### 1. Bartolo I

On March 24, 2017, Plaintiff filed a complaint in D.C. Superior Court in *Bartolo I* against Whole Foods and Scott Allshouse, Case No. 2017 CA 001987 B. Plaintiff asserted four counts. He brought breach of implied contract, promissory estoppel, and wrongful discharge claims against Whole Foods. ECF No. 1-2 (*Bartolo I*). He also brought a retaliation claim under the DCWTPA against both Whole Foods and Allshouse. ECF No. 1-2. On June 23, 2017, Judge Brian Holeman dismissed Plaintiff's suit against Allshouse on the grounds that he was never Plaintiff's employer. ECF No. 6 at 3, 11 (*Bartolo I*). On July 21, 2017, Defendant removed *Bartolo I* to federal court where it was docketed as Case Number 17-cv-1453. Notice of Removal, ECF No. 1 (*Bartolo I*).

2.     Bartolo II

On February 13, 2018, Plaintiff filed the second complaint in *Bartolo II* in D.C. Superior Court, Case No. 2018 CA 001093 B. Plaintiff sued Whole Foods and Jane Mueller for defamation. ECF No. 3-3; Superior Court Dkt. and Record, ECF No. 5, at 5, 9. On June 4, 2018, Judge Michael Rankin dismissed Mueller from the suit because Plaintiff failed to effectuate proper service. ECF No. 5, at 2, 9, 13–15. On July 17, 2018, Plaintiff removed *Bartolo II* to federal court and it was assigned Case Number 18-cv-1681. Notice of Removal, ECF No. 3. On October 1, 2018, Plaintiff filed an Amended Complaint, which alleged five counts against Whole Foods for defamation, breach of implied contract, unjust enrichment and conversion, promissory estoppel, and violation of the DCWTPA. Compl., *Bartolo II*, ECF Nos. 7, 9.

A total of nine counts are at issue in the two cases before this court. Defendant has moved for summary judgment on all counts. *See* Def.'s Mot. Plaintiff has moved for partial summary judgment on Count V in *Bartolo II*, his EVA bonus claim under the DCWTPA. *See* Pl.'s Partial Mot.

## III.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In assessing a motion for summary judgment, the court considers all relevant evidence presented by the parties. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

The court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the court determines "no reasonable jury could reach a verdict in [his] favor," then summary judgment is appropriate. *Wheeler v. Georgetown University Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). When ruling on a summary judgment motion, courts are "not to make credibility determinations or weigh the evidence." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

## IV.   DISCUSSION

### A.   Breach of Implied Contract, Promissory Estoppel, and Wrongful Discharge (Counts I, II, & III in *Bartolo I*)

In *Bartolo I*, Plaintiff brings claims for breach of implied contract, promissory estoppel, and wrongful discharge, which are based on violations of Whole Foods's General Information Guide ("GIG"), an employee handbook. *See* Compl., *Bartolo I* ¶¶ 21–30. The GIG sets out company policies regarding, among other things, anti-retaliation and reporting of misconduct. Def.'s Mot., Ex. Y, ECF No. 28-3, at 3–4. The GIG "prohibits any form of retaliation against any individual who reports workplace misconduct . . . or participates in the investigation of any such report or complaint" and states that "[v]iolation of this policy will result in corrective action up to and including discharge." *Id.* After receiving the GIG, Plaintiff signed a form acknowledging that the "GIG is simply a guide" and "is neither a contract of employment nor a legal document." ECF No. 14-10, at 14.

Defendant asks the court to grant summary judgment on all three counts, arguing that the court's previous decision in *Vasquez v. Whole Foods Market, Inc.*, 302 F. Supp. 3d 36 (D.D.C. 2018), is dispositive. Def.'s Mot. at 15–16. In response, Plaintiff offers a specific argument only as to Count I and does not even mention the other two counts. Pl.'s Opp. at 41–43. Plaintiff thus

has swept the three counts together as Defendant has done. *See id.* The court therefore will do the same.[2]

The court previously held in *Vasquez* that Whole Foods's "GIG creates no judicially enforceable contractual rights." 302 F. Supp. 3d at 61. In coming to this decision, the court relied on the absence of promissory language in the GIG, as well as the fact that the GIG "expressly disclaims that it is a contract and affirms the at-will nature of the employment relationship." *Id.* at 59–60. The court adopts that decision here and incorporates its analysis and reasoning. *See id.* at 59–62.

Plaintiff attempts to distinguish *Vasquez*, but his reasoning is unconvincing. *See* Pl.'s Opp. at 41–43. Plaintiff argues that the *Vasquez* decision was narrow and did "not address any anti-retaliation provision of the GIG." *Id.* at 42. He further argues that "[t]he anti-retaliation provision is different from the progressive discipline provision [at issue in *Vasquez*] because disclaimers do not insulate an employer from liability for breach of implied contract when it fails to abide by its self-imposed obligations in an employee manual." *Id.* The GIG disclaimer, Plaintiff says, is "rationally at odds" with the anti-retaliation portion of the GIG, which "prohibits any form of retaliation and affirmatively encourages employees to report to Whole Foods with the promise that they will discipline retaliators." *Id.* at 42.

Plaintiff is wrong to suggest that the anti-retaliation provision creates a contractual right when no other part of the GIG has such effect. The GIG simply sets forth a company policy prohibiting retaliatory conduct. It explains that Whole Foods prohibits retaliation and encourages "discussion of workplace issues," and that violations of that policy will result in corrective action.

---

[2] The court notes that Count III for wrongful discharge is not a contract or quasi-contract claim. Under D.C. law wrongful discharge is a tort, *see, e.g.*, *Bereston v. UHS of Delaware, Inc.*, 180 A. 3d 95, 104 (D.C. 2018), and would not rise or fall on the text of the GIG. But neither party argues that Count III is a tort, so the court does treat it as divorced from the GIG.

ECF No. 28-3, at 3–4. Nothing more is specified or promised. Thus, "[n]o reasonable employee could read the GIG's disclaimers and the permissive language prevalent in the GIG and conclude that Whole Foods" had intended to create a contractual right from the company's general anti-retaliation provision. *Vasquez*, 302 F. Supp. 3d at 61. That makes this case fundamentally different than those relied upon by Plaintiff. *Cf. Strass v. Kaiser Found. Health Plan*, 744 A.2d 1000, 1012 (D.C. 2000) (holding that "personnel manual that states specific preconditions that must be met before employment will be terminated is sufficiently clear to rebut the presumption of at-will employment") (citation omitted); *Dantley v. Howard Univ.*, 801 A.2d 962, 965 (D.C. 2002) (relying on *Strass* and holding that there was a genuine dispute of fact as to whether the plaintiff was fired consistent with restructuring plan); *Mawakana v. Bd. of Trs.*, 113 F. Supp. 3d 340, 349 (D.D.C. 2015) (holding that the plaintiff stated a breach of contract claim in light of university's handbook on standards and procedures regarding tenure); *Greene v. Howard Univ.*, 412 F.2d 1128, 1133–35 (D.C. Cir. 1969) (holding that contract claim arose when the university failed to give timely notice of termination). The court therefore grants Defendant summary judgment as to Counts I–III in *Bartolo I*.

B. **Retaliation Claim (Count IV in *Bartolo I*)**

In Count IV of *Bartolo I*, Plaintiff brings a retaliation claim under the D.C. Wage Theft Prevention Act ("DCWTPA"). As relevant here, the DCWTPA provides:

> It shall be unlawful for any employer to discharge . . . or retaliate against any employee or person because that employee or person has . . . Made or is believed to have made a complaint to his or her employer . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter or the Living Wage Act.

D.C. Code § 32-1311. Plaintiff asserts that he was a whistleblower fired for reporting violations of the Gainsharing Program. Pl.'s Opp. at 23–25.

Courts in this District are to apply the *McDonnell Douglas* burden-shifting framework to statutory retaliation claims arising under District of Columbia law. *See, e.g., Payne v. District of Columbia Gov't*, 722 F.3d 345, 353 (D.C. Cir. 2013) ("In conducting the analysis of the *prima facie* case under the [District of Columbia Whistleblower Protection Act], we must use the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."); *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (applying the *McDonnell Douglas* framework to a District of Columbia Human Rights Act retaliation claim); *Carpenter v. Fed. Nat. Mortg. Ass'n*, 174 F.3d 231, 235 n. 3 (D.C. Cir. 1999) (same). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation, *see Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003), which requires that he show: (1) he "engaged in statutorily protected activity"; (2) his "employer took an adverse personnel action against" him; and (3) a causal connection exists between the two, *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999); *see also Carney v. American University*, 151 F.3d 1090, 1095 (D.C. Cir. 1998). If a plaintiff makes this showing by a preponderance of the evidence, *Baumann v. District of Columbia*, 795 F.3d 209, 219 (D.C. Cir. 2015) (citation omitted), then the burden shifts to the employer to offer "a legitimate, nondiscriminatory reason" for the termination decision. *Taylor*, 350 F.3d at 1292 (quoting *Stella v. Mineta*, 284 F.3d 135 144 (D.C. Cir. 2004)). The burden then shifts back to the plaintiff to show that the defendant's proffered reasons are pretextual. *Id.* But when, as here, the employer proffers a non-retaliatory reason for disciplining the plaintiff, the prima facie case falls away, and "[t]he 'one central inquiry' that remains is whether a reasonable jury could infer retaliation or discrimination from all the evidence." *Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016) (citation omitted).

Defendant argues that Plaintiff's retaliation claim fails for two reasons. First, no genuine dispute of material fact exists because Plaintiff never made phone calls to the tip line, and accordingly, never engaged in protected activity. Def.'s Mot. at 17–20. Second, Defendant contends that even if Plaintiff did call the tip line, Defendant had legitimate, non-retaliatory reasons for firing him, which the Plaintiff cannot rebut with a showing of pretext. Def.'s Mot. at 20–23. The court addresses each argument in turn.

### 1. Protected Activity

The court rejects the assertion that no genuine dispute of material fact exists as to whether Plaintiff engaged in protected activity. The parties spend significant time going back and forth as to whether Plaintiff actually called the tip line to report allegations of gainsharing manipulation. *See, e.g.*, Def.'s Mot. at 7, 17–19; Pl.'s Opp. at 5–6, 24–25. This exchange misses the mark. The key question, for purposes of this case, is whether a decisionmaker at Whole Foods *thought* that Plaintiff had engaged in protected activity. The DCWTPA protects any person or employee who "[m]ade or *is believed to have made a complaint*." D.C. Code § 32-1311 (emphasis added). Here, there is evidence from which a reasonable jury could find that Scott Allshouse, perhaps the key decision-maker involved in Plaintiff's firing, believed that Plaintiff had engaged in statutorily protected activity by encouraging others to call the tip line to report Gainsharing Program manipulation. *See Jefferson v. Milvets Sys. Tech., Inc.*, 986 F. Supp. 6, 12 n. 7 (D.D.C. 1997) (noting that "testimony, combined with the coincidental timing of [the plaintiff]'s discharge and the impeachment of several . . . witnesses, could permit a reasonable jury to infer that the plaintiff was fired . . . for . . . [the decisionmaker's] fear that the plaintiff would assist [another employee] in pursuing a Title VII claim" and treating such a situation as a potential Title VII violation) (citing

circuit cases and D.D.C. case interpreting Title VII broadly in the retaliation context).[3]  Plaintiff

claims that Allshouse "directed [Plaintiff] to stop telling team members to call the tip line," and to

"report [gainsharing abuses] to him directly and not the tipline."  Pl.'s Resp. to 1st Interrog. at 9;

Bartolo Dep. at 421–22.  Allshouse made this statement, according to Plaintiff, during a meeting

at the Georgetown store just a few days after Plaintiff told Whole Foods investigators about the

gainsharing manipulation and his urging other employees to call the tip line.  Pl.'s Resp. to 1st

Interrog. at 9; Bartolo Dep. at 421–22.  If this event in fact occurred, Plaintiff would be protected

under the DCWTPA.

Defendant dismisses Plaintiff's recitation of events, characterizing it as self-serving and

uncorroborated.  The D.C. Circuit, however, has cautioned against rejecting a plaintiff's testimony

as "self-serving" merely because it is beneficial.  "[E]vidence a party proffers in support of its

cause will usually, in some sense, be 'self-serving.'"  *Johnson v. Perez*, 823 F.3d 701, 710 (D.C.

Cir. 2016).  Such testimony is to be disregarded only if it "is so undermined as to be incredible."

*Chenari v. George Washington Univ.*, 847 F.3d 740, 747 (D.C. Cir. 2017) (citation omitted).

Plaintiff's testimony clears this low bar.  Indeed, there is some evidence to corroborate it.

Handwritten notes from Plaintiff's interview show that Plaintiff told investigators he had urged

others to report Gainsharing violations.  Ex. Z.  Another Whole Foods executive, David Gearheart,

testified that Allshouse would have had access to investigation materials, presumably including

---

[3] *See also Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 642 (7th Cir. 2013) ("The parties agree that [Plaintiff] engaged in activity protected by Title VII by helping [another employee] organize and file his Title VII retaliation suit"); *Speedy v. Rexnord Corp.*, 243 F.3d 397, 404 (7th Cir. 2001) ("[O]ur cases have held that assisting another employee with her discrimination claim is protected opposition conduct") (citing *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996)); *cf. E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541, 545 (6th Cir. 1993) ("[C]ourts have routinely adopted interpretations of retaliation provisions in employment statutes that might be viewed as outside the literal terms of the statute in order to effectuate Congress's clear purpose in proscribing retaliatory activity."); *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989) (finding that allegations that Defendant, a university, retaliated against Plaintiff by encouraging her husband to take a teaching position elsewhere served to "amplify" her claim of retaliation).

notes of Plaintiff's interview, in November or early December 2016. Gearheart Dep. at 118–21.[4] A reasonable jury therefore could conclude that Allshouse had read Plaintiff's interview transcript and understood him to have encouraged other employees to call the tip line. And, while Allshouse claims not to remember telling Plaintiff that Plaintiff should have directed employees to him, he does recall meeting with Plaintiff to discuss gainsharing violations. Allshouse Dep. at 133–35. Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Allshouse learned through the interview notes what Plaintiff told investigators and then confronted him about it. These facts, if true, give rise to protection under the DCWTPA.

### 2. Pretext

Defendant next argues that even if Plaintiff engaged in protected activity, he was fired for a "legitimate, nondiscriminatory reason." *Taylor*, 350 F.3d at 1292 (citation omitted). On February 13, 2017, the day after Jane Mueller visited the Georgetown store, Mueller, Allshouse, Gearheart, and Wescoe met to "recap[]" the store visit. Wescoe Dep. at 46. They discussed the store's condition and Plaintiff's failure to follow "the direction and guidance" he was given. *Id.* According to Defendant, it was at that meeting that Whole Foods leadership decided to terminate Plaintiff for "gross insubordination" and "for failure to follow . . . direction and guidance." Def.'s Mot. at 11 (citing Wescoe Dep. at 47). Plaintiff's "Team Member Separation Form" states that he was let go for "flagrant or repeated disregard of safety procedures, including food safety." Ex. 3, ECF No. 16-3. Defendant argues that Plaintiff "cannot dispute the proffered reasons for his termination" because Defendant's reasoning is supported by (1) the temporal proximity between Plaintiff's "post-closure insubordination" and his firing; (2) "ample pictorial evidence of

---

[4] At Plaintiff's deposition, there was considerable discussion as to whether the notes from the interview were accurate. Bartolo Dep. at 173–77. This inquiry again misses the point. Regardless of whether the notes were accurate, if Allshouse had access to them, he would have been able to make inferences regarding Plaintiff's behavior based on what was transcribed, accurate or not.

[Plaintiff's] failures during February 9, 2017 through February 12, 2017"; "well-documented and near-contemporaneous criticisms concerning [Plaintiff's] past failures to follow direction;" and (3) evidence of a similarly-situated Store Team Leader who supposedly also raised concerns about gainsharing violations but was not terminated. Def.'s Mot. at 20–21. In response, Plaintiff offers a number of reasons why Defendant's explanations for his termination appear pretextual. Pl.'s Opp. at 25–33.

The court agrees that genuine disputes of material fact remain on the issue of pretext. The court focuses on two fact disputes. First, even though Defendant suggests that the termination decision was made at the February 13 meeting, Allshouse sent a text message two days before on February 11, 2017, to Ken Meyer, the Executive Vice President of Operations, stating, "I [w]ant to write Jane up and ask JM to leave with a separation agreement. Can you support that decision." Ex. W at 11. A few minutes later, Allshouse sent a second message: "Again. I'm offering him a separation agreement. Pay to go. And remind him that he takes good care of TMs and to keep that in mind to not hurt them by doing anything crazy." *Id.* at 12. Those text messages were sent one day *before* Mueller's visit to the Georgetown store. Therefore, a reasonable jury could conclude that Allshouse made the decision to fire Plaintiff—or, at least, set his firing in motion— before the February 12 visit to the Georgetown store by Mueller, and thus reject Defendant's claim that Mueller's store observations triggered Plaintiff's termination.

Second, it would be reasonable for a jury to infer pretext from Defendant's claim of "gross insubordination" when it had awarded him a raise and had granted him transfer just a week before. *See* Wescoe Decl. at ¶ 7; ECF No. 14-11, at 2. It strikes the court as curious that Defendant would offer Plaintiff what was essentially a promotion, and then turn around and fire Plaintiff a week later. While is it true that the Georgetown store was shut down in the interim, Defendant was well

aware of the ongoing rodent problem in the Georgetown store at the time that it transferred Plaintiff and prior to the Health Department's visit. In fact, the problem had been ongoing for several years, even before Plaintiff's start at the store. Defendant was also already aware of concerns about Plaintiff's failure to keep the store in good condition, and yet it still chose to offer him the transfer and raise. Allshouse Dep. at 177 (noting "some concerns" about Plaintiff's failure to meet expectations of keeping the store in good condition prior to February 6, 2017). In other words, the justifications that Defendant points to were not new as of February 9, 2017, when the Georgetown store closed.

In summary, the court finds that there is enough evidence in the record that a reasonable jury could conclude Defendant's stated reasons for Plaintiff's termination were pretextual. Accordingly, the court denies summary judgment on Plaintiff's retaliation claim.

## C.    Defamation Claim (Count I in *Bartolo II*)

In his complaint in *Bartolo II*, Plaintiff alleges that Defendant made "a false and defamatory statement" when Mueller and Allshouse "announced at a meeting of team members and to other individuals that Plaintiff [] was terminated because his actions led to the [Georgetown] store being closed down by the Health Department and because of the rodent issue." Compl., *Bartolo II* at ¶ 24. Defendant argues that there is no evidence that any such statements were made, and even if they were, they would be entitled to a qualified privilege. *See* Def.'s Mot. at 32–37. Plaintiff, however, has offered enough evidence to create a fact issue.

To bring a successful defamation claim, Plaintiff must show: (1) that Defendant "made a false and defamatory statement concerning" Plaintiff; (2) that Defendant "published the statement without privilege to a third party;" (3) that Defendant's "fault in publishing the statement amounted to at least negligence;" and (4) "that the statement was actionable as a matter of law irrespective

of special harm or that its publication caused the plaintiff special harm." *Crowley v. North American Telecomm. Ass'n*, 691 A.2d 1169, 1172 n.2 (D.C. 1997) (citation omitted).

Although Plaintiff initially alleged that both Mueller and Allshouse announced that Plaintiff was terminated because his actions led to the closure of the Georgetown store, Compl., *Bartolo II*, ¶ 24, in his opposition Plaintiff does not point to any evidence in the record of Mueller's alleged statement, nor does he even mention Mueller when addressing his defamation claim. *See* Pl.'s Opp. at 43–45. For her part, Mueller remembered the meeting in question, but did not recall mentioning that Plaintiff was terminated because of the Georgetown store closure. Mueller Decl., ¶¶ 13–14. Thus, there is no evidence of a defamatory statement by Mueller.

Plaintiff does, however, offer evidence of a statement made by Allshouse. During his deposition, Gruber testified about a conversation on the sales floor with Allshouse. Gruber Dep. 86–88. He said that "there was a time on the sales floor when [] Allshouse said he found a mice nest and said, this is the reason why [Plaintiff's] being terminated, not because the store was shut down, because of all the other things." *Id.* at 86. Gruber explained that the "meeting," which involved a "small group of people," took place "during that whole cleanup process right after the store was shut down and everybody came to the store . . . at some point that night he said it." *Id.* at 86–87.

Defendant contends that Plaintiff's reliance on Gruber's testimony to support his defamation claim is foreclosed because it is a "newly-pled theory" not contained in his complaint. Def.'s Reply in Support of Def.'s Mot., ECF No. 35, at 16–17. Not so. "[P]leadings serve specific functions of giving notice of the general nature of the case and the circumstances or events upon which it is based, so the parties can prepare and the court can dispose of the case properly." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 16 (D.C. Cir. 2008) (citation

and internal quotation marks omitted). "A specific quantity of facts" is not required. *Id.* In his complaint, Plaintiff alleges an incident during which Allshouse announced to "team leaders *and to other individuals*" that Plaintiff was fired because of the rodent infestation. Compl., *Bartolo II*, ¶ 24. Gruber's testimony offers exactly that—a conversation during which Allshouse told Whole Foods employees that Plaintiff was fired because of the Georgetown store's mouse problem. The complaint sufficiently put Defendant on notice of "the general nature" and "the circumstances or events" surrounding Plaintiff's defamation claim. *See Aktieselskabet*, 525 F.3d at 16. The court does not consider this a newly pleaded theory.

The court agrees with Defendant's argument that Allshouse's statement is likely covered by a qualified privilege, because it was made by a former employer about a former employee to current employees with an interest in knowing about a change in store team leadership. *See Turner v. Federal Express Corp.*, 539 F. Supp. 2d 404, 409 (D.D.C. 2008); *see also Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 879 (D.C. 1998) (citing *White v. Nicholls*, 44 U.S. 266, 287 (1845) ("The law has long recognized a privilege for anything 'said or written by a master in giving the character of a servant who has been in his [or her] employment.'"). Accordingly, Plaintiff, who is seeking to overcome the privilege, must show that the speaker acted with malice. *Turner*, 539 F. Supp. 2d at 409 (citation omitted). Malice is essentially "the equivalent to bad faith." *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C. 1983) (citation omitted). "[A] qualified privilege exists only if the publisher believes, with reasonable grounds, that his statement is true." *Id.* at 478 (citation omitted).

For the same reasons that a jury could find Defendant's explanation for Plaintiff's firing pretextual, it also could find that Allshouse acted with actual malice when he announced at a team meeting that Plaintiff was fired because of rodent-control issues. If Defendant's stated reasons for

firing Plaintiff were pretextual, and Plaintiff in fact was fired for urging others to report gainsharing manipulation, a jury could conclude that Allshouse's explanation for Plaintiff's termination was false and that it was made in bad faith. After all, if a jury were to find that Allshouse caused Plaintiff to be fired for a retaliatory purpose, it likewise could find that Allshouse defamed Plaintiff by giving Plaintiff's former colleagues a knowingly false reason for his termination. The court therefore denies summary judgment as to Plaintiff's defamation claim.

### D. EVA Bonus (Count V in *Bartolo II*)

Plaintiff's unpaid wages claim under the DCWTPA rests on the assertion that Defendant failed to pay him approximately $11,000 as an unpaid bonus under the company's EVA bonus plan. *See* Compl. ¶¶ 36–41. Plaintiff seeks partial summary judgment as to this claim. *See* Pl.'s Partial Mot. at 2–4. Defendant argues that the EVA bonus does not qualify as "wages" under the DCWTPA, and regardless, Plaintiff never earned the money. Accordingly, it requests that the court grant summary judgment.

Under the DCWTPA, "[w]henever an employer discharges an employee, the employer shall pay the employee's wages earned not later than the working day following such discharge." D.C. Code § 32-1303. Wages are defined as "all monetary compensation after lawful deductions, owed by an employer" including a "bonus" and "[o]ther remuneration promised or owed." D.C. Code § 32-1301(3). Bonuses that are discretionary, and therefore not guaranteed compensation, "do not fall under the definition of 'wages'" because they "are not owed, but are given only by leave of the employer." *Dorsey v. Jacobson Holman, PLLC*, 756 F. Supp. 2d 30, 36 (D.D.C. 2010).

Whole Foods's Store Leadership EVA Incentive Compensation Plan awards bonuses to eligible Store Team Leaders. Determining bonus compensation under the EVA Plan involves a

multi-step process in which (1) a Store EVA Pool amount is calculated based on the store's performance during the fiscal quarter; (2) the Store EVA Pool is allocated to Store Leaders' Individual Pools; and (3) a Quarterly EVA Payout is calculated using the Individual Pool balance and "other store performance requirements." Pl.'s Partial Mot., Ex. 4, ECF No. 16-4, at 2–6. If the Quarterly EVA Payout amount "is negative or zero, a payout will not occur for the current fiscal quarter." *Id.* at 4. Any unearned balance in the Individual Pool will be carried forward to the next quarter. *Id.* at 5. As Mike Grady, a Senior Analyst of Business Systems for Whole Foods, explained in his declaration, EVA bonuses are not paid until the end of a fiscal quarter, and even then, they are only paid if the EVA pool yields a positive, final figure based on a store's performance. Def.'s Mot., Ex. 24, ECF No. 14-41, ¶¶ 7–8. Thus, the carried pool balance "does not reflect monies actually 'earned' by either Plaintiff or the store and is instead a mere component of the [next quarter's] EVA calculation." *Id.* at ¶ 7.

On February 15, 2017, Defendant paid Plaintiff his $15,777.55 EVA bonus from the previous fiscal quarter ending on January 14, 2017. *Id.* at ¶ 12. The same day, Plaintiff also had an Individual Pool balance of $10,777.54. Pl.'s Partial Mot., Ex. 1, ECF-16-1, at 2. Defendant did not yet have the data necessary, however, to calculate an EVA bonus for the following fiscal quarter ending on April 14, 2017. *See* ECF No. 14-41, ¶ 11. A positive Individual Pool bonus does not necessarily guarantee a Quarterly EVA Payout if the Team Leader's store performed poorly. In such cases, the Individual Pool amount would be carried over until the next quarter, but no bonus would be awarded. *See* ECF No. 16-4, at 5–6.

The court need not answer the question of whether the EVA bonus qualifies as wages under DCWTPA because the money Plaintiff seeks was never earned and therefore is not owed to him. Under the statute, "the employer shall pay the employee's wages earned not later than the working

day following such discharge." D.C. Code § 32-1303. In other words, the employer must pay out what the employee had earned at the time of his termination. At the time of Plaintiff's termination, the EVA payout could not have been earned, let alone calculated, because the end of the fiscal quarter was still several months away. What is more, when the calculation was run at the end of the fiscal quarter, the bonus pool amount was -$74,018.19, meaning that the Total Quarterly EVA Payout amount was zero. Therefore, Plaintiff would not have been entitled to a bonus even if he had remained at the company. Def.'s Resp. to Pl.'s Prop. Stmt. of Undisputed Material Facts, ECF No. 22-1, ¶ 7; Supp. Decl. of Gregory Casas, ECF No. 22-4, Ex. 1 (May 31, 2017 email explaining that Plaintiff's bonus pool amount at the end of the fiscal quarter was -$74,018.19, which means that there were no pool funds from which he could be paid a bonus.). Plaintiff disputes none of these facts.

Plaintiff nevertheless argues that he is owed the amount in his Individual Pool as of February 15, 2017, because individuals who are not terminated for "cause" and do not leave to work for a competitor, "may earn any balances remaining in the Individual Pool." ECF No. 16-4, at 14. In such cases, however, the Individual Pool amount is still not paid immediately. Rather, the employee "will be paid the balance remaining in the Individual Pool on the 5th Friday following the end of the fiscal quarter in which he/she leaves the company." *See id.* Accordingly, an employee who left the company on February 15, 2017, would have received the Individual Pool balance in his or her account five Fridays after April 14, 2017. The money was not earned as of the employee's departure date. It defies logic to suggest that Defendant could pay money that was not yet earned or even calculated as of February 15, which was the day that Defendant was legally obligated to pay any owed wages. The court grants Defendant summary judgment on Count V.

### E.    Quasi-Contract EVA Bonus Claims (Counts II, III, & IV in *Bartolo II*)

Plaintiff brings breach of implied contract, unjust enrichment and conversion, and promissory estoppel claims relating to the $11,000 EVA bonus.  Defendant moves for summary judgment on all three counts, claiming that Plaintiff relied on "striking falsehoods," and calling the counts "re-pleadings of his claim brought under the [DCWTPA]."  Def.'s Mot. at 23.  Plaintiff's only response is that these three claims rise and fall with his DCWTPA claim.  Pl.'s Opp. at 41.  He makes no argument as to why the quasi-contract claims should survive on their own.  *See id.*  Accordingly, because the court rejects Plaintiff's DCWTPA claim, it also rejects all three of his quasi-contract claims.  Summary judgment is granted in favor of Defendant on Counts II, III, and IV in *Bartolo II*.

### F.    After-Acquired Evidence

Defendant argues that after-acquired evidence of a "scheme" by Plaintiff to lease out Whole Foods' parking spots after hours, inappropriate emails to female subordinates, and an extramarital affair with a fellow employee "would have resulted in [Plaintiff's] immediate termination" and  therefore Plaintiff's "claim for damages relating to front pay" and his request for reinstatement should be stricken.  Def.'s Mot. at 37–38.

After-acquired evidence does not "preclude liability altogether."  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1117 (D.C. Cir. 2000) (citing *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360–63 (1995)).  Rather, in a case where "an unlawful motive was the sole basis for the firing," *McKennon*, 513 U.S. at 359, "neither reinstatement nor front pay is an appropriate remedy for unlawful termination where there is after[-]acquired evidence of wrongdoing that would have led to termination on legitimate grounds had the employer known about it." *Frazier Indus. Co., Inc. v. N.L.R.B.*, 213 F.3d 750, 760 (D.C. Cir. 2000) (quoting *McKennon*, 513 U.S. at

361–62) (internal quotation marks omitted). Backpay may also be limited by after-acquired evidence. *McKennon*, 513 U.S. at 362. Liability is not entirely foreclosed, however, because the employer "could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason." *Id.* at 360. An employer seeking to limit damages by "rely[ing] upon after-acquired evidence of wrongdoing, [] must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362–63.

The after-acquired evidence that Defendant asks the court to consider, if relevant at all, is the kind of evidence that goes to compensatory damages and would be submitted to a jury. *See, e.g.*, *Cross v. Samper*, 501 F. Supp. 2d 59, 65 (D.D.C. 2007) (allowing the Defendant "to introduce its after-acquired evidence and to argue to the jury that any compensatory damages . . . should be limited."). Further, the question of whether reinstatement or front pay are appropriate cannot be answered until a jury has first decided whether Plaintiff's termination was unlawful. Accordingly, the court will not consider the after-acquired evidence at the summary judgment stage.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and denies in part Defendant's Motions for Summary Judgment, ECF Nos. 14 (*Bartolo II*) and 50 (*Bartolo I*). The court denies Plaintiff's Partial Motion for Summary Judgment, ECF No. 15 (*Bartolo II*).

Dated:  September 30, 2019                 _____
                                            Amit P. Mehta
                                            United States District Court Judge